# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Respondent,<br><br>    v.<br><br>JASON BROCK GRAHAM,<br><br>                     Appellant. | No. 59702-1-II<br><br><br>UNPUBLISHED OPINION |

CHE, J. — Jason Graham appeals his conviction for second degree unlawful possession of a firearm (UPFA2).

While investigating a report of squatters on private property, Deputy Elijah Page observed several stolen or suspected stolen vehicles. Deputy Page also encountered Graham, who had a pocketknife attached to his pants and a window striker in his back pocket. Deputy Page asked Graham if he had any other weapons on him, and Graham responded that he had a firearm. Deputy Page frisked Graham, finding the firearm. Based on a prior felony conviction, the State charged Graham with UPFA2.

Graham moved to suppress the firearm, but the trial court denied his motion, concluding that Deputy Page lawfully stopped and frisked him. Graham proceeded to trial and was convicted.

Graham argues the trial court erred by denying his motion to suppress the firearm, he received ineffective assistance of counsel, and his conviction violates the Second Amendment.

We hold the trial court properly denied Graham's motion to suppress, Graham did not receive ineffective assistance of counsel, and Graham's conviction does not violate the Second Amendment.

Accordingly, we affirm.

FACTS

I. BACKGROUND

In July 2023, Deputy Page received a call from a property owner, reporting that multiple squatters with trailers were on the property and they were increasing in number. Deputy Page and his partner investigated and confirmed at least one stolen vehicle among several suspected stolen vehicles. During the investigation, Graham exited a recreational vehicle (RV) on the property and approached the deputies. Deputy Page noticed a window striker in Graham's back pocket and a pocketknife attached to Graham's pants.[1]

Due to safety concerns, Deputy Page informed Graham that he would frisk him for weapons and asked Graham if he had any other weapons on his person. Graham responded that he had a pistol on his person. Deputy Page and his partner frisked Graham and found a firearm under Graham's belly band.

The State charged Graham with UPFA2 due to a prior felony bail jumping conviction.

II. MOTION TO SUPPRESS

Graham filed a CrR 3.6 motion to suppress evidence stemming from his arrest. The trial court held a hearing on the motion.

---

[1] According to Deputy Page, window strikers "are used to shatter glass and gain access to vehicles." 1 Rep. of Proc. (Feb. 16, 2024) at 27.

Deputy Page testified that on the day of the arrest, he arrived at the property around midday and observed trailers, vehicles, and motorcycles, several of which appeared to be stolen due to multiple visible enrichment factors.[2] Enrichment factors include vehicles without license plates, with broken windows, with forged trip permits, and with self-tinted front windows. Based on Deputy Page's training, once he confirmed that at least one vehicle on the property was stolen, he considered the property a high crime area. Deputy Page called his partner to the scene due to the "higher risk atmosphere with stolen vehicles." 1 Rep. of Proc (Feb. 16, 2024) (1 RP) at 26. Deputy Page explained that situations where there appear to be multiple stolen vehicles generally require more than one officer. He explained that suspects may need to be detained, and that "[s]ometimes guns are involved." 1 RP at 26.

Deputy Page testified that sometimes people who steal vehicles "use them in furtherance of other dangerous crimes, such as robbery and burglaries," and thus, he routinely asks suspects in those cases whether they are armed. 1 RP at 10. Based on Deputy Page's training, if a suspect answers that they are armed, he will detain and frisk the person for safety reasons.

As Deputy Page and his partner investigated the property, Graham exited an RV approximately 20 feet away and approached the deputies. Deputy Page asked Graham if he lived in the RV, and Graham answered affirmatively. Deputy Page noticed a window striker in Graham's back pocket and a pocketknife attached to Graham's pants.

Based on safety concerns, Deputy Page asked Graham whether he had other weapons on his person. Graham disclosed he had a pistol on him. Deputy Page conducted a safety frisk of Graham because Deputy Page had reasonable suspicion a crime had occurred. This was based

---

[2] Several of the vehicles were confirmed stolen.

3

upon confirmation that at least one of the vehicles on the property was stolen coupled with the stolen vehicle's proximity to Graham's RV. During the frisk, the deputies found a firearm with no serial number, one round in the chamber, and a fully loaded extended magazine. Once Deputy Page knew Graham had a firearm, Graham was not free to leave.

Defense counsel argued that Deputy Page had seized Graham without reasonable suspicion. Defense counsel further argued the stop was improper because Graham had simply been in close proximity to suspected stolen vehicles and the window striker and pocketknife on his person were "not identified as particularly suspicious" or of a nature which produced "particularized suspicion of criminal activity." 1 RP at 43. Lastly, defense counsel argued that Graham's presence in a high crime area was insufficient, on its own, to justify a stop.

The State responded that Deputy Page had reasonable and articulable suspicion to believe Graham was in possession of a burglary tool as well as stolen motor vehicles when he was seized. Further, the State argued that the stop and frisk occurred during an investigation which began in response to reports of trespassers and escalated into an investigation of stolen vehicles. Lastly, the State argued the "frisk was the result of safety concerns mainly. . . . [Deputy Page] did need to, uh, ensure his and [his partner]'s safety by seizing that gun." 1 RP at 45.

Defense counsel responded:

Case law cites—and I'm sorry I don't have the cite; I think it's *Terry*—but I understand that Miranda's not required when asking about weapons. However, officers are allowed to speak, but they're not allowed to seize the individual. That's —that's my only response.

1 RP at 46.

The trial court entered the following written findings of fact and conclusions of law:

4

On July 18, 2023, [Deputy] Elijah Page was dispatched to [the address] in Clark County, WA for a report of squatters on the property. At the time he was investigating a possible trespass.

When he arrived, he saw numerous recreational vehicles, cars, and motorcycles in plain view. [Deputy] Page has training in the recovery and investigation of stolen vehicles as a TDU[3] [Deputy] with 8 years of experience.

Many of the vehicles [Deputy] Page observed had no license plates. A pick-up on the property had a broken window and tinted front windows. These are enrichment factors which are often present in stolen vehicle situations.

While the deputies were on site, Jason Graham exited a motor home on the property. [Deputy] Page could clearly see a pocketknife on Mr. Graham's belt and a window striker in his back pocket. [Deputy] Page told Mr. Graham not to reach for those items and asked him if he had any other weapons. Mr. Graham answered that he had a pistol. At that time, Mr. Graham was asked where the pistol was and he said his front waist. Mr. Graham was placed in handcuffs and searched, and the pistol was recovered.

Based on the above findings, this stop of Mr. Graham was lawful. At the point a knife was seen, [Deputy] Page had grounds to frisk Mr. Graham to determine whether there were additional weapons present.

Clerk's Papers at 41-42.

The case proceeded to trial, and witnesses testified consistently with the facts above. The jury convicted Graham, and the trial court sentenced Graham to 60 months confinement.

ANALYSIS

I. THE CrR 3.6 MOTION

Graham argues the trial court erred in denying his CrR 3.6 motion. Specifically, he challenges the trial court's conclusion that "[a]t the point a knife was seen, [Deputy] Page had grounds to frisk Mr. Graham to determine whether there were additional weapons present." Br. of Appellant at 8. Graham also argues that Deputy Page was not justified in conducting a protective frisk for weapons. Specifically, Graham argues "[Deputy] Page did not articulate any specific facts, and indeed there were no such facts in the record, which would create an

---

[3] Tactical Detective Unit.

5

objectively reasonable belief that Graham was presently dangerous." Br. of Appellant at 9. We disagree.[4]

On review of a trial court's denial of a CrR 3.6 motion, we review findings of fact for substantial evidence and conclusions of law de novo. *State v. McGee*, 26 Wn. App. 2d 849, 864, 530 P.3d 211 (2023) aff'd, 3 Wn.3d 855 (2024). Unchallenged findings of fact are verities on appeal. *State v. Floe*, 35 Wn. App. 2d 55, 57 n.1, 572 P.3d 1268 (2025).

Article I, section 7 of the Washington State Constitution commands: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." It deems warrantless searches unreasonable unless an exception to the warrant requirement applies. *State v. Pines*, 17 Wn. App. 2d 483, 489, 487 P.3d 196 (2021). The State bears the burden to show that an exception applies in a particular circumstance. *Id*.

One exception to the warrant requirement is a *Terry*[5] stop. *Id.* at 490. *Terry* allows police to "stop and detain an individual for investigation if the officer reasonably suspects the person is engaged or about to be engaged in criminal conduct." *Id.*

During a lawful *Terry* stop, if a reasonable safety concern exists, officers may conduct a brief, nonintrusive search for weapons to the extent necessary for protective purposes. *State v. Martin*, 14 Wn. App. 2d 425, 431-32, 465 P.3d 368 (2020). "A protective frisk does not violate

---

[4] The parties contest whether this challenge is properly preserved for appeal under RAP 2.5(a)(3). We hold that Graham's challenge is properly preserved because the trial court explicitly ruled on the issue of whether the frisk was lawful. Further, the State argued below that the frisk was necessary for safety reasons, and at the CrR 3.6 hearing, defense counsel responded to that argument. Thus, the issue was before the trial court, and the trial court ruled on it. The issue is preserved, and we need not conduct a RAP 2.5(a)(3) analysis.

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

a defendant's rights when (1) the initial stop is legitimate, (2) a reasonable safety concern exists to justify a protective frisk for weapons, and (3) the scope of the frisk is limited to the protective purpose." *Id.* at 432.

To determine whether a reasonable safety concern existed at the time of the frisk, "'we consider the totality of the circumstances, including the officer's subjective belief.'" *Id.* (quoting *State v. Day*, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007)). The question is "whether a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger.'" *Id.* (quoting *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993)). Stated another way, "'A reasonable safety concern exists, and a protective frisk for weapons is justified, when an officer can point to specific and articulable facts which create an objectively reasonable belief that a suspect is armed and presently dangerous.'" *Id.* (internal quotation marks omitted) (quoting *Collins*, 121 Wn.2d at 173).

Certainty that the suspect is armed is not required for a reasonable safety concern to exist. *Id.* "'A founded suspicion is all that is necessary, *some basis from which the court can determine that the frisk was not arbitrary or harassing.*'" *Collins*, 121 Wn.2d at 173 (internal brackets omitted) (quoting *State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989)). Further, we are reluctant to substitute our judgment for that of officers in the field. *State v. Russell*, 180 Wn.2d 860, 867-68, 330 P.3d 151 (2014).

Graham assigns error only to the trial court's conclusion that "[a]t the point a knife was seen, [Deputy] Page had grounds to frisk Mr. Graham to determine whether there were additional weapons present." Br. of Appellant at 2. Therefore, the unchallenged facts are verities on appeal. *Floe*, 35 Wn. App. 2d at 57 n.1.

Here, Deputy Page pointed to specific and articulable facts that supported a belief that Graham could be armed and presently dangerous, which justified the protective frisk. Deputy Page had been dispatched to investigate suspected trespassing and upon arrival noticed several suspected stolen vehicles. Deputy Page had already confirmed that at least one vehicle on the property was stolen and had noticed several enrichment factors related to other suspected stolen vehicles. Based on the stolen vehicles, Deputy Page considered the property a "higher risk atmosphere" and knew that with suspects in similar circumstances, "[s]ometimes guns are involved." 1 RP at 25-26. Graham approached the deputies and Deputy Page noticed that Graham had a pocketknife and a window striker on his person. Both items were consistent with car prowling tools and could be used as weapons. Both items were easily and immediately accessible to Graham. Deputy Page testified that he frisked Graham due to safety concerns given the circumstances of the investigation.

Under the totality of the circumstances, a reasonably prudent person in Deputy Page's position, at the time he observed the pocketknife and window striker on Graham, would be warranted in the belief that their safety or that of others was in danger. Thus, we agree with the trial court that Deputy Page had grounds to protectively frisk Graham to determine whether there were additional weapons present at the time the pocketknife was observed.[6] Deputy Page observed and identified specific and articulable facts that created a reasonably objective founded suspicion of danger given the circumstances, and his frisk of Graham was not arbitrary or harassing.

---

[6] Moreover, before Deputy Page performed the protective frisk, Graham told Deputy Page that Graham had a pistol on his person.

Graham appears to argue his possession of the pocketknife did not establish that he was armed and dangerous because pocketknives are legal to carry and are not considered dangerous weapons pursuant to RCW 9.41.250[7] and 9.41.270.[8]  But neither the issue of whether Graham legally carried the pocketknife, or whether the pocketknife constituted a dangerous weapon or weapon capable of producing harm, are the standard for determining whether an officer is justified in conducting a protective frisk.  Instead, the standard is whether a reasonably prudent person in the officer's circumstances would be warranted in the belief that their safety or that of others was in danger.  Additionally, Deputy Page did not frisk Graham merely because he saw Graham possessed a pocketknife.  The Deputy conducted a protective frisk due to the circumstances related to the higher risk investigation on private property after reports of trespassers, observation of stolen vehicles, and after a suspect approached the deputies with visible items that could be used as weapons.  We conclude that this argument is unpersuasive.

Next, Graham submits his admission to Deputy Page that he had a firearm did not establish he was armed and dangerous because the presence of a weapon alone does not justify a frisk.  He relies on *Collins* and *State v. Olsson*[9] to make this point.  He argues that unlike in

---

[7] RCW 9.41.250 lists items that are per se "dangerous weapons" for the crime of unlawful possession of dangerous weapons, a gross misdemeanor.  The list does not include pocketknives.

[8] RCW 9.41.270(1) prohibits a "person [from] carry[ing], exhibit[ing], display[ing], or draw[ing] any . . . knife or other cutting or stabbing instrument . . . in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other[s]."  With limited exceptions, doing so constitutes a gross misdemeanor.  *See* RCW 9.41.270(2)-(3).

[9] 78 Wn. App. 202, 895 P.2d 867 (1995).

*Collins* and *Olsson*, here "there were no other circumstances indicating Graham posed a threat to [Deputy] Page or others." Br. of Appellant at 14. We find this argument unavailing.

*Collins* and *Olsson* do not support Graham's argument. Graham correctly recognizes that in those cases, both courts considered the totality of the circumstances in evaluating the lawfulness of protective frisks. *See Collins*, 121 Wn.2d at 177 (considering defendant's prior access to a firearm, time of day of stop, and defendant's prior felony arrest), and *Olsson*, 78 Wn. App. at 208 (considering that there were other people in defendant's car and that defendant had already produced a knife for the officer). However, Graham's assertion that Deputy Page was faced with no threatening circumstances other than knowledge that Graham possessed a firearm ignores the totality of the circumstances, as explained above. As a result, Graham's comparisons to *Collins* and *Olsson* are unpersuasive. [10]

Graham also contends the frisk was unwarranted because Graham was "cooperative and forthcoming," "made no attempt to flee," "did not act aggressively or do anything unusual," and "did not access or point a weapon" at officers. Br. of Appellant at 15. While Graham may have exhibited these behaviors, they do not negate the other circumstances, already discussed, that justified the frisk. Graham does not cite to any authorities showing that the opposite of the contended behaviors above must occur before police may conduct a protective frisk. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no

---

[10] In response to Graham's argument, the State counters that *Olsson* shows "the discovery of one weapon is a valid factor supporting a weapons frisk for additional weapons." Br. of Resp't at 21. We agree.

authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none"). Thus, this argument fails.

To the extent Graham suggests that Deputy Page's belief that Graham was dangerous prior to conducting the frisk was "not objectively believable," we disagree. Br. of Appellant at 17 (citing *Day*, 161 Wn.2d at 895). That Deputy Page was investigating suspected trespass and stolen vehicles, that he observed multiple enrichment factors, and that he saw both a pocketknife and a window striker on Graham's person, are unchallenged facts, and thus, verities on appeal. *Floe*, 35 Wn. App. 2d at 57 n.1. Moreover, Deputy Page indicated these types of higher risk situations often involve guns, and Graham admitted to having a gun on his person before the frisk, which had a round in the chamber, a fully loaded extended magazine, and no serial number.

Further, to the extent Graham argues that as a result, "[t]he weapons search exceeded the permissible scope of a *Terry* stop," we disagree because, for the reasons already discussed, Deputy Page was justified in conducting a protective frisk at the point when he saw Graham's pocketknife. Br. of Appellant at 18.

We conclude the trial court properly denied Graham's motion to suppress evidence of the firearm.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Graham argues he received ineffective assistance of counsel because defense counsel failed to argue that the frisk was unlawful at his suppression hearing. Graham asserts that if defense counsel had argued Deputy Page's frisk was unlawful, the trial court would have

granted his motion to suppress, and the State would have dismissed the charges against him. We disagree.

Both our state and federal constitutions guarantee criminal defendants the right to effective assistance of counsel. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. Graham bears the burden of showing (1) defense counsel's performance fell beneath an objective standard of reasonableness and (2) such performance prejudiced the defense. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

"Failure to bring a plausible motion to suppress is deemed ineffective if it appears that a motion would likely have been successful if brought." *State v. Meckelson*, 133 Wn. App. 431, 436, 135 P.3d 991 (2006) (holding that there was ineffective assistance of counsel where defense did move to suppress but failed to argue a particular, likely meritorious, ground for suppression). "Moreover, a claim of ineffectiveness due to failure to move to suppress on a particular basis can be undermined to some degree if counsel moved to suppress on another ground." *State v. Nichols*, 161 Wn.2d 1, 15, 162 P.3d 1122 (2007).

Here, defense counsel did not argue below the lawfulness of the frisk; instead, defense raised arguments only about the lawfulness of the initial stop. However, as already discussed, the trial court properly denied Graham's motion to suppress not only because Graham was lawfully stopped, but also because he was lawfully frisked. Because we conclude above that the frisk was lawful, defense counsel's lack of argument on the issue does not constitute ineffective assistance of counsel. Graham's ineffective assistance of counsel claim fails.

### III. SECOND AMENDMENT

Finally, Graham asserts an as-applied constitutional challenge to his UPFA2 conviction, arguing that his conviction violates his Second Amendment rights because his predicate conviction of bail jumping is a non-violent felony. Graham contends that the State cannot justify prohibiting non-violent felons, including those previously convicted of bail jumping, from possessing firearms. We disagree.

We review constitutional challenges to statutes de novo. *State v. Koch*, 34 Wn. App. 2d 232, 237, 567 P.3d 653 (2025) (published in part). Incorporated to the states through the Fourteenth Amendment, the Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II, XIV; *Koch*, 34 Wn. App. 2d at 237.

Second Amendment challenges are subject to a two-part test. *Koch*, 34 Wn. App. 2d at 243. "First, we must determine whether 'the Second Amendment's plain text covers an individual's conduct.'" *Id.* (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)). If so, the second part of the test requires that "'the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *N.Y. State Rifle*, 597 U.S. at 24, 142 S. Ct. 2111).

Discussing the first part of the test, *Koch* instructs, "felons—who are not law-abiding citizens—are not among the class of people that the Second Amendment covers." *Id*. This applies to those convicted of non-violent felonies as well as those convicted of violent felonies because neither are "law-abiding citizens." *Id.* at 244.

No. 59702-1-II

Graham's contention—that the State cannot prohibit non-violent felons from possessing firearms, including those previously convicted of bail jumping—fails because felons, both violent and non-violent, are not covered by the Second Amendment. See *id*. Because Graham's claim fails on the first part of the test, the State need not justify the regulation by showing that it is consistent with this country's historical tradition of firearm regulation.

CONCLUSION

We hold the trial court properly denied Graham's motion to suppress, Graham did not receive ineffective assistance of counsel, and Graham's conviction for UPFA2 does not violate the Second Amendment.

Accordingly, we affirm.

A majority of the panel, having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, P.J.

Glasgow, J.

14